**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
—————————————————————————————

**WILLIAM M.,**

                         **Plaintiff,**

              **v.**                                    **3:20-CV-635**
                                                        **(FJS)**

**COMMISSIONER OF SOCIAL SECURITY,**

                         **Defendant.**
—————————————————————————————

**APPEARANCES**                          **OF COUNSEL**

**OLINSKY LAW GROUP**                    **HOWARD D. OLINSKY, ESQ.**
250 South Clinton Street
Suite 210
Syracuse, New York 13202
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**      **CHRISOPHER LEWIS POTTER, ESQ.**
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, Massachusetts 02203
Attorneys for Defendant

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court are the parties' cross-motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  *See* Dkt. Nos. 12, 13.


### II. BACKGROUND

On May 15, 2017, Plaintiff applied for both Disability Insurance Benefits and

Supplemental Security Income, alleging his disability began on March 15, 2012, due to anxiety.

*See* Dkt. No. 12 at 1.  The Social Security Administration denied both applications on August 9, 2017.  *See id.*  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  *See id.*  On November 15, 2018, Plaintiff appeared at a hearing before ALJ Robert Wright.  *See* Dkt. No. 11, Administrative Record ("AR"), at 15.[1]

On January 10, 2019, the ALJ issued a written decision in which he made the following findings:

> (1) Plaintiff "meets the insured status requirements of the Social Security Act through March 31, 2014";
>
> (2) Plaintiff "has not engaged in substantial gainful activity since March 15, 2012, the alleged onset date";
>
> (3) Plaintiff "has the following severe impairments: degenerative disc disease of the lumbar and cervical spine, osteoarthritis in the knees, generalized anxiety behavior, and drug and alcohol disorder";
>
> (4) Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1";
>
> (5) Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to unskilled work, which is simple, routine, and low stress, defined as having only occasional decision making, changes in the work setting, or interactions with others";
>
> (6) Plaintiff "has no past relevant work";
>
> (7) Plaintiff "was born on March 11, 1976 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date";

---

[1] References to page numbers in the Administrative Record are to the Bates Stamp numbers, which are located in the bottom right hand corner of the pages.  References to page numbers to all other documents in the record are to the page numbers that the Court's Electronic Case Filing System generates, which are located in the top right corner of the pages.

(8) Plaintiff "has at least a high school education and is able to communicate in English";

(9) "Transferability of job skills is not an issue because [Plaintiff] does not have past relevant work";

(10) Based on Plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform"; and

(11) Plaintiff "has not been under a disability, as defined in the Social Security Act, from March 15, 2012, through the date of this decision."

*See* AR at 17-26 (citations omitted).

Plaintiff requested that the Social Security Administration's Appeal Council review the ALJ's decision.  The Appeals Council denied that request, thereby making Defendant's decision final.  *See* Dkt. No. 12 at 2.

On June 8, 2020, Plaintiff filed this action appealing Defendant's final decision.  *See id.* Plaintiff filed a supporting brief on December 7, 2020, to which Defendant filed a responsive brief on January 20, 2021.  *See* Dkt. Nos. 12, 13.

In support of his motion, Plaintiff argues that (1) there is not substantial evidence in the record to support the ALJ's residual functional capacity ("RFC") determination because there are no medical opinions in the record to guide the ALJ's analysis, and he failed to consider all of the evidence; and (2) the ALJ failed to provide reasons for his finding that Plaintiff's subjective allegations were inconsistent with the medical record.  *See* Dkt. No. 12 at 1.

## III. DISCUSSION

**A.     Standard of review**

Absent legal error, a court reviewing the Commissioner's final decision will uphold that decision if there is substantial evidence in the record to support it.  *See* 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" of evidence and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richard v. Parales*, 402 U.S. 389, 401 (1971) (quotation omitted).  Accordingly, a reviewing court "'may not substitute [its] own judgment for that of the [Commissioner], even if [it] might justifiably have reached a different result upon a de novo review.'"  *Cohen v. Comm'r of Soc. Sec.*, 643 F. App'x 51, 52 (2d Cir. 2016) (summary order) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).  In other words, "[t]he substantial evidence standard means once an ALJ finds facts, [a reviewing court] can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'"  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (quotation and other citation omitted).

To qualify for social security benefits, a claimant must show that he suffers from a disability within the meaning of the Act.  An individual is considered disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  Substantial gainful activity ("SGA") is 'work activity that involves doing significant physical or mental activities . . . for pay or profit."  20 C.F.R. § 404.1572(a)-(b).  To determine if a claimant has sustained disability within the meaning of the Act, the ALJ follows a five-step process:

(1) The ALJ first determines whether the claimant is currently engaged in SGA. *See* 20 C.F.R. §§ 416.920(b), 416.972. If so, the claimant is not disabled. *See* 20 C.F.R. § 416.920(b).

(2) If the claimant is not engaged in SGA, the ALJ determines if the claimant has a severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(c). If not, the claimant is not disabled. *See id.*

(3) If the claimant has a severe impairment, the ALJ determines if the impairment meets or equals an impairment found in the appendix to the regulations (the "Listings"). If so, the claimant is disabled. *See* 20 C.F.R. § 416.920(d).

(4) if the impairment does not meet the requirements of the Listings, the ALJ determines if the claimant can do his past relevant work. *See* 20 C.F.R. § 416.920(e), (f). If so, the claimant is not disabled. *See* 20 C.F.R. § 416.920(f).

(5) If the claimant cannot perform his past relevant work, the ALJ determines if he can perform other work, in light of his RFC, age, education, and experience. *See* 20 C.F.R. § 416.920(f), (g). If so, then he is not disabled. *See* 20 C.F.R. § 416.920(g). A claimant is only entitled to receive benefits if he cannot perform any alternative gainful activity. *See id.*

For this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step, if the analysis proceeds that far. *See Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

## B.    ALJ's residual functional capacity determination

In reaching his RFC determination, the ALJ "considered all symptoms and the extent to which th[o]se symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." *See* AR at 20. He also "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c."

*See id.* With regard to his consideration of Plaintiff's symptoms, the ALJ followed a two-step process. First, he "determined whether there is an underlying medically determinable physical or mental impairment(s) -- i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques -- that could reasonably be expected to produce [Plaintiff's] pain or other symptoms" . . . [and s]econd [if such are shown] he "must evaluate the intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] functional limitations." *See id.* Moreover, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must consider other evidence in the record to determine if [Plaintiff's] symptoms limit the ability to do work-related activities." *See id.*

At the hearing, Plaintiff testified that he suffered "from severe pain in the right shoulder and lower back, which ha[d] resulted in poor shoulder movement and difficulty standing and sitting for prolonged periods." *See id.* Plaintiff also stated that, "despite compliance with medications, he still [could not] lift and carry heavy weight and the pain radiate[d] into the upper and lower extremities." *See id.* at 20-21. Moreover, Plaintiff asserted that "he [was] often anxious and require[d] medications for sleeping." *See id.* at 21. Nonetheless, he stated that "he ha[d] no difficulty completing activities of daily living such as dressing and bathing [although] based on his overall condition, [Plaintiff] contend[ed] that he [was] unable to sustain work on a full-time basis." *See id.*

After considering Plaintiff's allegations and the evidence, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting

effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" *See id.* Moreover, the ALJ stated that, with regard to Plaintiff's "statements about the intensity, persistence, and limiting effects of his . . . symptoms, they [were] inconsistent with the medical record." *See id.*

With regard to Plaintiff's physical impairments, the ALJ referred to the following record evidence. In September 2014, a physical evaluation showed Plaintiff was "'largely unremarkable'" and that "there was little evidence of muscle edema, irregular heartbeat, or difficulty breathing." *See* AR at 21 (citing 20F at 13-27). The following year, although Plaintiff complained about right knee pain, Dr. James Terzian's x-ray report "revealed no joint effusion, fracture, or dislocation." *See id.* (citing 1F at 70; [*id.* at] 90 and 94). In addition, although Plaintiff fell on his left knee, Dr. Luis Bentancourt stated that Plaintiff "ambulated with only a 'slight' bump and [that his] MCL appeared stable." *See id.* (citing [1F] at 76). Moreover, "physical evaluation showed that [Plaintiff] had only 'mildly' reduced range of motion in the left knee and no more than moderate tenderness in the right knee." *See id.* (citing [1F] at 82 and 94).

In December 2015, Plaintiff "reasserted allegations of knee pain" after he had completed physical therapy; however, he "reported that pain was only a four out of ten." *See id.* (citing 1F at 55). Furthermore, "Dr. Bentancourt observed that Plaintiff "ambulated with a normal gait and displayed little evidence of muscle edema." *See id.* (citing [1F] at 58 and 68).

Moreover, with regard to Plaintiff's degenerative disc disease of the lumbar spine, Dr. Bajwa Zafar's x-ray report, dated May 2016, "showed only 'mild' multilevel degenerative disc disease" and a "follow-up MRI report in June 2016 showed that aside left paracentral disc herniation, there was normal alignment, body height, and 'mild:' diffuse disc bulging." *See id.* (citing 1F at 52; [1F] at 53).

From June 2016 to October 2016, physical evaluations showed that Plaintiff "was limping, and had limited range of motion and tenderness in the lumbar spine." *See* AR at 21 (citing 1F at 45 and 50). However, "the same physical evaluations showed that [Plaintiff] retained normal strength in [his] lower extremities, as well as normal breathing." *See id.* (citing [1F at 45 and 50]). Then, in January 2017, Valentina Davydov, D.O. reported that Plaintiff "had regain[ed] full range of motion in the lumbar spine, as well as strength in the musculoskeletal system." *See id.* (citing 1F at 102-103).

By May 2017, Michael Freeman, D.O., Plaintiff's long-time treating physician, reported that Plaintiff "was physically normal with no muscle edema. *See id.* at 21 (citing 1F at 5). Dr. Freeman also observed that, "[d]espite active osteoarthritis and allegation of pain in the back and knees, . . . [Plaintiff] had only a 'moderate' muscle spam [sic] in his back." *See id.* (citing [1F] at 8). In addition, Dr. Bajwa noted that, although Plaintiff "ambulated abnormally with limited range of motion in the lumbar spine, . . . [he] had normal coordination, sensation, and [an] x-ray report of the lumbar spine reveal[ed] little evidence of spinal canal stenosis or cord compression." *See id.* at 21-22 (citing [1F] at 11 and 16).

Subsequently, in October 2017, Plaintiff alleged shoulder pain; and a physical evaluation "revealed limited range of motion and tenderness in his shoulder." *See id.* at 22 (citing 22F at 10). An x-ray of Plaintiff's right shoulder showed a close fracture. *See id.* (citing [22F] at 11; 23F at 11). However, Plaintiff did not "comply with follow-up appointments, including an orthopedic evaluation." *See id.* (citing [22F] at 13 and 20). Moreover, in January 2018, F.N.P. Julie Vernold conducted physical evaluations that "showed that [Plaintiff] had full range of motion in the neck area and ambulated steady." *See id.* (citing 22F at 23-25; 24F at 8).

During a separate physical evaluation in the same month, Dr. Thomas Gudas observed that Plaintiff "had 'grossly normal' musculoskeletal, no pain with range of motion, and . . . [improved] symptoms. . . ." *See id.* (citing 14F at 3). "In addition, Dr. Gudas stated that a CT scan of [Plaintiff's] brain revealed no intracranial abnormality." *See id.* (citing [14F] at 13).

Furthermore, the ALJ noted that "physical evaluations in March and July 2018 continued to show that [Plaintiff] had a normal range of motion in the neck area with intact reflexes." *See* AR at 22. Despite Plaintiff having "difficulty standing, and walking on his toes and heels, Ms. Vernold reported that he retained full strength in the lower and left extremities." *See id.* (citing 22F at 42; 49; and 51).

Then, in August 2018, Dr. Franklin Wetzel stated that an "x-ray report of [Plaintiff's] back revealed only 'mild' age appropriate disc space narrowing with no instability." *See id.* (citing 22F at 53). Furthermore, "[p]hysical evaluation showed that despite limited range of motion and tenderness in the back, [Plaintiff] had no swelling, edema, deformity, or muscle spasm." *See id.* (citing [22F at 53]). In September 2018, "Ms. Vernold and Betty Lee, N.P. recalled that [Plaintiff] regained full range of motion in the musculoskeletal system and noted that [Plaintiff] had been 'noncompliant' with [his] therapeutic plan." *See id.* (citing [22F] at 60-61; 23F at 4). In addition, an x-ray of Plaintiff's "back during this period showed no abnormal motion despite residual evidence of degenerative disc disease." *See id.* (citing 22F at 68).

Based on this evidence, the ALJ concluded that, "in spite of [Plaintiff's] multiple unremarkable physical evaluations, taking into account the combined effect of his physical impairments and considering his subjective allegations along with a history of back and shoulder pain as well as osteoarthritis in the knees," he would "limit[] [Plaintiff] to performing no more than light exertional work. Particularly, there was some evidence of limited range of motion and

difficulty walking." *See id.*  The ALJ concluded that "[t]his evidence support[ed] [Plaintiff's]

limitation of no more than light exertional work." *See id.*

With regard to Plaintiff's mental impairments, the ALJ began by noting that, "in March

2012, [Plaintiff] was hospitalized for reportedly consuming 24 beers per day and was unable to

stop drinking." *See* AR at 22 (citing 19F at 1).  However, after Plaintiff went through detox, "Dr.

Freeman reported that [he] was subsequently discharged in stable condition and [a] mental status

examination revealed he had normal judgment, insight, and no suicidal ideations." *See id.* (citing

[19F] at 6 and 30).  Furthermore, in August 2012, an "outpatient mental health therapy record . . .

revealed that [Plaintiff] had good hygiene, intact speech, and logical thinking." *See id.* (citing

17F at 2 and 6).  "[D]espite [Plaintiff's] allegation of persisting generalized anxiety behavior and

difficulty sleeping, he had no psychosis or impaired memory." *See id.* (citing [17F] at 6).

Furthermore, the ALJ noted that "the record during this period showed that [Plaintiff] was only

marginally complian[t] with therapy because he had only attended one verbal and one medical

appointment, and had cancelled or failed to show up for three appointments." *See id.* at 22-23

(citing [17F] at 20).

Furthermore, "[b]y April 2013, Ryan Kim, D.O. disclosed that [Plaintiff] was alert,

oriented, and retained normal memory and judgment." *See* AR at 23 (citing 20F at 27 and 31).

Dr. Kim also noted that Plaintiff's "mental status examination showed little evidence of suicidal

ideations or homicidal thoughts." *See id.* (citing [20F at 27 and 31]).  Then in August 2014, Dr.

Michael Talarico "recalled that [Plaintiff] had been mentally stable and despite persisting

anxiety, he was noncompliant with the medical regimen." *See id.* (citing 17F at 28).

Furthermore, "during this period, [Plaintiff] reported that his symptoms had improved, he had

not experienced panic attacks in some time, and [had spent] increasing time . . . outside with others.  *See id.* (citing [17F] at 51).

The ALJ also noted that, "[b]y April and June 2015, [Plaintiff] denied feeling hopeless or depressed, and [a] mental status examination showed that he had appropriate mood, affect, and unimpaired memory, insight, and judgment."  *See id.* (citing 1F at 72 and 87).  Furthermore, "between June 2016 and October 2016, Dr. Freeman noted that [Plaintiff] had appropriate affect and mood, as well as fair insight and judgment."  *See id.* (citing 1F at 46, 60, and 68).

In January 2017, Plaintiff was found to have "poor insight and judgment; however, he was 'negative' for feeling down or experiencing hopeless or little interest in things."  *See AR* at 23 (citing 1F at 35).  "In addition, [Plaintiff] appeared to have appropriate mood and affect."  *See id.* (citing [1F at 35]).  Furthermore, in April 2017, despite Plaintiff's "ongoing allegation of severe generalized anxiety behavior and difficulty sleeping . . ., Dr. Freeman reiterated that, mentally, [Plaintiff] was oriented, had normal memory, appropriate affect, and fair judgment.  *See id.* (citing 1F at 5, 11, and 22).

Although Plaintiff "was hospitalized in September 2017 for visual hallucinations, he was subsequently discharged in stable and improved condition, and [a] CT scan of [Plaintiff's] head by Dr. Jayaraman showed that it was normal."  *See id.* (citing 1F at 16-20).  A "follow-up mental status examination in January 2018 by Dr. Davydov and Ms. Vernold continue[d] to show that [Plaintiff] was cooperative, pleasant, and had normal mood and affect.  *See id.* (citing 14F at 3; 2F at 34).

Despite Plaintiff's separate hospitalization during this period for difficulty sleeping and increased visual hallucinations, Dr. Ken Young "reported that [Plaintiff] had been drinking and [that a] mental status examination showed logical thought content, clear speech, good eye

contact, and no evidence of suicidal ideations." *See id.* (citing 16 at 2-4).  In addition, Dr. Agop

Tashchian "subsequently discharged [Plaintiff] after less than a week and found that he was no

longer anxious, depressed, or experiencing suicidal ideations." *See id.* (citing 16F at 5-6).  Dr.

Tashchian also "observed that [Plaintiff] had good eye contact and 'grossly' intact cognitive

functioning and judgment." *See id.* (citing [16F at 5-6]).

By February 2018, Plaintiff "was again discharged from outpatient physical

therapy for noncompliance." *See* AR at 23 (citing 17F at 16).  Debra Mieroop, L.C.S.W. "stated

that [Plaintiff] had attended only three screen sessions [and] five verbal therapy sessions [and]

had] cancelled or failed to show up for seven other appointments." *See id.* (citing [17F] at 4).

Then, in May 2018, the record revealed that Plaintiff "had a flat affect and [was] drinking 10-20

beers per day." *See id.* (citing 17F at 21).  Even so, Ms. Venold's mental status examination of

Plaintiff showed that he "was cooperative[;] and [she] discharged him in stable condition." *See

id.* (citing [17F] at 21).  A "follow-up mental status examination in July 2018 revealed that

[Plaintiff] was friendly, had normal speech, organized thoughts, and was only 'mildly' anxious."

*See id.* at 24 (citing 11F at 12).  Plaintiff "even reported a good relationship with some family

members." *See id.* (citing [11F at 12]).  Around this same time, "Ms. Lee observed that

[Plaintiff] had stable mood and affect." *See id.* (citing 23F at 4).  "[B]y December 2018, Christin

Wilder, C.A.S.A.C. suggested that [Plaintiff] was doing fairly well, including compl[ying] with

NA and AA meetings, and appearing cooperative and understanding his mental diagnosis." *See

id.* (citing 26F).

The ALJ noted that "[r]egardless of [Plaintiff's] multiple mental stability, taking into

account the combined effect of mental illnesses [sic] impairments, including a history of severe

anxiety, excessive drinking, and hospitalizations, [he was] limit[ing] [Plaintiff] to unskilled

work, which is simple, routine, and low stress, defined as having only occasional decision making, changes in the work setting, or interaction with others." *See id.*

With regard to the medical opinions, the ALJ noted that, "in August 2017, DDS medical consultant, A. Dipeolu, Ph.D., stated that there was insufficient evidence to establish that [Plaintiff] had a severe impairment." *See id.* at 24 (citing 2A). The ALJ concluded that this opinion was "clearly contrary to the medical record . . . showing that [Plaintiff] has severe generalized anxiety behavior and substance and alcohol abuse disorder." *See id.* Therefore, the ALJ gave little weight to this opinion. *See id.*

Furthermore, the ALJ stated that "the evidence reveal[ed] that [Plaintiff] was assigned GAF scores of 50 and 70." *See id.* (citing 16 and 17F). The ALJ noted that GAF scores were merely "snapshots" of a person's functioning at the time they were issued and, thus, lacked longitudinal perspective. *See id.* Moreover, the ALJ noted that these scores were vague and did not provide a function-by-function assessment of Plaintiff's limitations; and, therefore, he had accorded these scores little weight. *See id.*

Finally, the ALJ noted that his "residual functional capacity assessment [was] supported by the medical evidence, including physical and mental examinations, as well as objective imaging reports from 2012 to 2018." *See id.* He explained that "[t]he evidence show[ed] that [Plaintiff] had consistently normal physical and mental evaluations, responded well to the medical treatment, and experienced little adverse effects from the prescribed medications." *See id.* However, he also noted that "there was evidence that [Plaintiff] ambulated abnormally and was psychiatrically admitted on several occasions." *See id.* In sum, "[b]ased on the totality of the evidence and taking into account [Plaintiff's] subjective allegations," the ALJ concluded that Plaintiff retained the capacity to perform light work with the stated limitations. *See id.*

**C.**     **ALJ's duty to develop the record**

The Second Circuit has held that, based on the non-adversarial nature of social security proceedings, the ALJ has an affirmative duty to develop the administrative record. *See Hernandez v. Comm'r of Soc. Sec.*, No. 1:13-cv-959 (GLS/ESH), 2015 WL 275819, *2 (N.D.N.Y. Jan. 22, 2015) (quoting *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, *11 (E.D.N.Y. Sept. 11, 2012) (quoting *Garcia v. Apfel*, No. 98 CIV. 1370, 1999 WL 1059968, at *5 (S.D.N.Y. Nov. 19, 1999))) (other citation omitted).  This duty "includes obtaining the treating physicians' assessments of plaintiff's functional capacity." *Clobridge v. Astrue*, No. 5:07-CV-00691 (NAM), 2010 WL 3909500, *7 (N.D.N.Y. Sept. 30, 2010) (citing 20 C.F.R. § 404.1512(e); *Hardhardt v. Astrue*, 2008 WL 2244995, at *9 (E.D.N.Y. 2008)).

However, the ALJ is not required to develop the record further where all evidence in the record is consistent and sufficient such that the ALJ can make his determination without additional evidence.  *See Hernandez*, 2015 WL 275819, at *2 (citing 20 C.F.R. § 404.1520b(a)); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. Appx. 29, 34 (2d Cir. 2013) (summary order) (stating that "[w]here . . . the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity, . . . a medical source statement or formal medical opinion is not necessarily required . . . "); *Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013) (summary order) (rejecting plaintiff's argument that ALJ should have requested additional records to develop administrative record where she failed to identify specific records were missing or explain how the allegedly missing records would affect the ALJ's decision); *Heather C. v. Berryhill*, No. 5:17-cv-0962, 2019 WL 1432593, *3 (N.D.N.Y. Mar. 29, 2019).

Moreover, the ALJ is not required to develop the record further where it does not contain any "obvious gaps."  *See Hernandez*, 2015 WL 275819, at *2 (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)); *Breinin v. Colvin*, No. 5:14-CV-01166 (LEK/TWD), 2015 WL 7749318, *10 (N.D.N.Y. Oct. 15, 2015) (finding that ALJ had no duty to recontact plaintiff's treating physician where record contained sufficient evidence, which included plaintiff's statements, diagnostic test results, and medical findings to support ALJ's RFC findings).  In addition, the mere fact that the ALJ relied on opinions based on examinations rendered several years prior to the ALJ's decision does not make those opinions stale, especially where a plaintiff has not pointed to evidence indicating that his condition had significantly worsened since the examinations.  *See Maxwell H. v. Comm'r of Soc. Sec.*, No. 1:19-CV-0148 (LEK/CFH), 2020 WL 1187610, *5 (N.D.N.Y. Mar. 12, 2020).

In this case, Plaintiff's argument that the ALJ could not have rendered an RFC determination based on the evidence is unpersuasive.  Although Plaintiff contends that there were no medical opinions in the record, the ALJ cited to multiple medical reports and medical opinions in his decision.  *See generally* AR.  Furthermore, Plaintiff's argument that the ALJ should have ordered a consultative examination or contacted his treating physician is unconvincing because, where, as here, all the evidence in the record is consistent and sufficient, the ALJ was not required to develop the record further.  In addition, despite Plaintiff's contention that the treatment records contained nothing regarding his functional status or ability to work, the record contained sufficient evidence from which the ALJ could assess Plaintiff's RFC such that a medical source statement or formal medical opinion was not required.

Moreover, there are no obvious gaps in the record; and Plaintiff does not argue that any of his medical history was missing from the record.  Therefore, the ALJ did not have a duty to

recontact Plaintiff's physicians because there was sufficient evidence in the record, including Plaintiff's statements, test results, and medical reports.

Finally, although Plaintiff argues that the ALJ denied his application because of his failure to cooperate rather than on medical grounds, the record belies this argument.  In fact, there are multiple medical reports in the record that consistently state that Plaintiff was mentally and physically stable.  *See generally* AR.  Moreover, because Plaintiff has not pointed to evidence indicating that his condition has significantly worsened, the ALJ's reliance on medical examinations from several years prior was not improper.

Accordingly, for all of the above-stated reasons, the Court finds that the ALJ fulfilled his duty to develop the record and that the record contained substantial evidence to support the ALJ's RFC finding.

**D.     ALJ's evaluation of Plaintiff's impairments**

An ALJ should give a treating physician's opinion controlling weight where there is substantial evidence in the record to support it.  *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  In the absence of a treating source opinion in the record, it is within the ALJ's purview to obtain and rely on consultative opinions.  *See* 20 C.F.R. § 404.1519; *Annabi v. Berryhill*, No. 16-CV-9057 (BCM), 2018 WL 1609271, *17 (S.D.N.Y. Mar. 30, 2018) (quoting *Hooper*, 199 F. Supp. 3d at 815-16 (S.D.N.Y. 2016) (quoting 20 C.F.R. § 404.1519)).

Moreover, when relying on consultative opinions to formulate a claimant's RFC, it is the ALJ's duty to weigh the opinion evidence, provide reasons for the weight afforded, and review the entire record.  *See Tyler M. v. Saul*, No. 3:19-CV-426 (CFH), 2020 WL 5258344, *9 (N.D.N.Y. Sept. 3, 2000) (stating that, "[a]lthough an ALJ will consider medical opinions

regarding a plaintiff's functioning, ultimately the ALJ is tasked with reaching an RFC based on the record as a whole" (citation omitted)); *Christina M.F. v. Berryhill*, No. 5:17-CV-0840 (GTS), 2019 WL 147463, *7 (N.D.N.Y. Jan. 9, 2019) (stating that "the ALJ did precisely what she was expected to do: consider all of the opinion evidence and balance the differing opined limitations in light of the evidence as a whole when formulating the RFC").  When determining what weight to give the opinions of medical sources, the Social Security regulations require the ALJ to consider several factors, including "(1) Supportability . . .; (2) Consistency . . .; (3) Relationship with the claimant . . .; [and] (4) Specialization . . . ."  20 C.F.R. § 416.920c(c).

In this case, Plaintiff's assertion that the ALJ cherry-picked the evidence is unpersuasive because the record clearly indicates that the ALJ relied on substantial evidence indicating that Plaintiff's physical and mental symptoms were not disabling.  The ALJ considered all opinion evidence and balanced the differing limitations in light of the evidence as a whole when formulating Plaintiff's RFC.  Moreover, the ALJ expressly noted that there were some knee and spinal abnormalities as well as a closed fracture of Plaintiff's right shoulder.  *See* AR at 21-22.  Similarly, the ALJ recognized that Plaintiff had persisting anxiety symptoms during much of the alleged disability period as well as reported episodes of hallucinations.  *See id.* at 22-23.[2]

In addition, the ALJ reviewed the medical opinions and ultimately formulated an RFC based on the record as a whole.  Plaintiff's treating physician, Dr. Freeman, reported in a 2017 physical examination that Plaintiff was physically normal with no muscle edema and only a "moderate" muscle spasm in his back.  *See* AR at 21-22.  Similarly, Dr. Freeman observed in

---

[2] Although Plaintiff argues that the ALJ erroneously found at Step 2 that obesity was not a severe impairment, Plaintiff never included obesity in the detailed list of impairments that he told the ALJ were severe.  Furthermore, outside the obesity discussion, the ALJ stated that, although Plaintiff sometimes experienced abnormal gait and had some difficulty walking, his gait was frequently normal.  *See* AR at 21-22.

multiple mental status examinations from 2012 to 2017 that Plaintiff was oriented, had normal memory, appropriate affect, and fair judgment and insight. *See id.* at 22-23. These mental and physical examinations are consistent with other reports and medical opinions. For example, in 2018, Dr. Gudas observed that Plaintiff had "grossly normal" musculoskeletal, no pain with range of motion, and his symptoms had improved. *See id.* at 22. In addition, Dr. Gudas stated that a CT scan revealed no intracranial abnormality in Plaintiff's brain. *See id.* Finally, further physical evaluations from various doctors revealed that, despite a limited range of motion and tenderness, Plaintiff had no swelling, edema, deformity or muscle spasm. *See generally* AR.

Accordingly, based on the above, the Court finds that the ALJ's overall evaluation of the evidence was reasonable and thorough and that substantial evidence in the record supported his RFC determination.

**E.    ALJ's determination regarding Plaintiff's subjective allegations of his condition**

"As a fact-finder, the ALJ has 'the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence.' . . . Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.' . . ." *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotations omitted). "In assessing the credibility of the objective evidence of pain and disability provided by the plaintiff's testimony, the ALJ considers the objective medical evidence and a number of other factors." *Osborne v. Astrue*, No. 6:07-CV-0314 (LEK), 2010 WL 2735712, *7 (N.D.N.Y. July 9, 2010) (citing SSR 96-7p). These factors include the following:

> (1) The individual's daily activities;

(2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3) Factors that precipitate and aggravate the symptoms;

(4) The type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6) Any measures other than treatment the individual uses to relieve pain or other symptoms . . . ; and

(7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *8 (citing [SSR 96-7p]).

Furthermore, the ALJ is not required to discuss every piece of the evidence in the record explicitly. *See Brault*, 683 F.3d at 448. If the ALJ does not cite certain evidence, it does not mean that the ALJ failed to consider it. *See id.* (citation omitted). In addition, it is not for the court to reweigh the evidence based on a plaintiff's disagreement with the results. *See Michelle M. v. Comm'r of Soc. Sec.*, No. 3:18-CV-1065 (TWD), 2020 WL 495170, *8 (N.D.N.Y. Jan. 30, 2020) (collecting cases and stating that "it was within the ALJ's purview to weigh the evidence of record, resolve any inconsistencies therein, and make a determination consistent with the evidence as a whole"). It does not matter if the court or another ALJ may have weighed the evidence differently or reached a different determination on the plaintiff's credibility if there was substantial evidence in the record to support the ALJ's finding. *See Clark v. Comm'r of Soc. Sec.*, No. 7:13-CV-256 (FJS), 2016 WL 1057047, *6 (N.D.N.Y. Mar. 14, 2016) (stating that, "to the extent that Plaintiff points to evidence in the Administrative Record that reasonably might

support a conclusion that [Plaintiff] is disabled, 'whether there is substantial evidence supporting the [Plaintiff's] view is not the question' on appeal" (quotation omitted)).

In this case, Plaintiff argues that the ALJ failed to provide reasons for finding his allegations inconsistent with the medical records.  However, a review of the record shows that the ALJ considered Plaintiff's subjective allegations and compared them to the medical reports and imaging findings.  Based on his review, the ALJ found that Plaintiff's allegations were not entirely consistent with the evidence.

Furthermore, Plaintiff contends that the ALJ failed to provide any explanation for rejecting his subjective allegations; and, therefore, the Court should remand the case.  Contrary to Plaintiff's argument, however, the ALJ highlighted medical evidence in the record that tended to contradict Plaintiff's allegations.  For example, the ALJ contrasted Plaintiff's reported knee pain with examination findings of only mildly reduced knee range of motion, normal or only slightly impaired gait, and no knee joint effusion, fracture, or dislocation.  *See* AR at 21-22.  In addition, the ALJ recognized that Plaintiff reported severe back pain but contrasted this allegation with physical examination and imaging findings that showed mild abnormalities and predominantly normal strength.  *See id.*

Accordingly, for all these reasons, the Court finds that the ALJ's credibility determination was not "patently unreasonable"; and, in fact, there was substantial evidence in the record to support this determination.

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings, *see* Dkt. No. 12, is

**DENIED**; and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings, *see* Dkt. No. 13, is

**GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: September  9, 2021
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge